**STATE of Missouri, Respondent,**

v.

**Joshua HEMME a/k/a Joshua Lee Costlow, Appellant.**

**No. WD 54802.**

Missouri Court of Appeals, Western District.

June 9, 1998.

Gary E. Brotherton, Asst. Appellate Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for Respondent.

Before HOWARD, P.J., and BRECKENRIDGE and SPINDEN, JJ.

HOWARD, Presiding Judge.

Joshua Hemme appeals his convictions by a jury for first degree statutory rape in violation of § 566.032, deviate sexual assault in violation of § 566.070, and first degree statutory sodomy in violation of § 566.062.[1] In his sole point on appeal, Appellant contends the trial court erred in sustaining the State's motion to rejoin the count of deviate sexual assault with the counts of first degree statutory rape and first degree statutory sodomy.

### Facts

Appellant was indicted by the grand jury of Lafayette County on charges of statutory rape in the first degree in violation of § 566.032, deviate sexual assault in violation of § 566.070, and statutory sodomy in the first degree in violation of § 566.062, on May 20, 1996. Counts I and III charged that Appellant had sexual intercourse and deviate sexual intercourse, respectively, with S.Q., a minor child who was less than fourteen years old on or about February 28, 1996. Count II charged that Appellant had deviate sexual intercourse with J.B., a minor child, knowing that he did so without consent of J.B., on or about May 12, 1996.

On October 29, 1996, the court sustained Appellant's motion for severance of offenses in part, providing that Counts I and III would be tried together and Count II would be tried separately at a later date. On November 5, 1996, Counts I and III were tried to a hung jury and a mistrial was declared. On April 7, 1997, the court sustained the

---

1. All statutory references are to RSMo 1994.

state's motion to rejoin Count II. The cause was tried to a jury in the circuit court of Lafayette County on June 23 and 24, 1997. The jury convicted Appellant on all three counts.

Viewed in the light most favorable to the verdicts, the facts are as follows.

### Counts I and III

On February 28, 1996, S.Q., then 13 years old, arrived home from school and began doing her homework and watching t.v. in her living room. Appellant, age 19, called and wanted her to come over. She did not want to because she had a lot of homework, but he kept asking, so she asked her stepfather if she could go over to Appellant's house and he said yes. S.Q. had been seeing Appellant's younger brother Adam and had been to the Hemmes' house before. When S.Q. arrived, Appellant took her into the basement, where the recreation room and Adam's bedroom were located. At Appellant's request, she sat on the bed. Appellant asked S.Q. if she was scared to have sex. She responded that she was not scared, but did not really want to. Appellant took off S.Q.'s clothes and threw them away from the bed. He put his head between her legs and started to perform oral sex. He pushed S.Q.'s head to his penis and she performed oral sex on him. Appellant then got on top of her and had sexual intercourse. He asked her if it hurt and she said yes, but Appellant kept going.

When they heard Appellant's mother arrive home, S.Q. wiped the semen off of her leg and got dressed. She went out into the recreation room area and began to play Nintendo. Appellant began fingering her vagina and asked her to have sex again. She said no. Appellant kept asking. Eventually, S.Q. sat on the bed, Appellant pulled down her pants, and Appellant yelled at her to scoot up and put her legs around his neck. Appellant had sexual intercourse with her again. S.Q. put her clothes on and Appellant took her home in his van.

On April 5, 1996, S.Q. left her date book where her mother could find it. Her mother, P.Q., recognized her daughter's handwriting and noticed that the entry on the date of February 28 stated "the date I lost my V."

P.Q. went to her daughter's room and found the key to her diary. In the diary, S.Q. had written that the encounter was with Appellant.

P.Q. drove to Appellant's house and asked him to take a ride with her. Appellant said, "If this is about drugs, I didn't give them to her." P.Q. stopped the car and asked Appellant, "Did you have sex with my daughter?" Appellant responded, "I'm not going to lie to you. Yes, I did." Appellant also stated, "It didn't take very long." When asked if he had used a condom, Appellant said yes.

Appellant later asked S.Q. if her mother had found out because her mother had confronted him. S.Q. responded that she had left her date book for her mother to read because she did not want to tell her. Appellant told S.Q. that if he got in trouble, he was going to burn down her house.

### Count II

J.B. was 15 years old on May 12, 1996. She was a good friend of S.Q. and one year ahead of her in school. On May 10, 1996, J.B. met Appellant for the first time. J.B. was babysitting Tina Cooper's children. Appellant and his friend, Lane Wentland, were at Tina's house, along with Tina's boyfriend, Shawn Young, and Tina and her children. In front of the others, Appellant repeatedly asked J.B. to the movies. Although J.B. kept saying no, Appellant continued to ask four or five times. Appellant, Alisha McCurdy and J.B. spent the entire night at the house and Appellant left Saturday morning.

The next day, Appellant called and asked J.B. where she would be and she told him she would be at Tina's. J.B. did not invite Appellant over to Tina's. J.B. arrived at Tina's at 11:15 a.m. and Appellant arrived between 11:20 and 11:45 a.m., along with Lane Wentland.

After Tina and Shawn had left, J.B., Appellant and Lane sat around and watched movies for an hour to an hour and a half. J.B. went to take a shower. She tried to put the younger child in bed because he was cranky and tired. He would not stay in his own bed because there was too much commotion, so she took him to Tina's room to lay

him down for a nap and she laid down with him for approximately twenty minutes.

Appellant came in and laid down on the bed. He began kissing J.B.'s neck as the kids were running in and out of the room. Appellant put his hands up J.B.'s shirt, under her bra. She told him to stop and that she did not want him to. Appellant stopped temporarily, but started again a few minutes later. Appellant then put his hands down her pants, inside her underwear, and put his fingers in her vagina. Appellant began to take off J.B.'s shorts and underwear and she tried pulling them back up, but Appellant took them off. Appellant put his mouth and tongue inside her vagina. He got up and locked the door because the boys kept coming in.

Appellant then took out his penis and tried to have sex with her. He said, "You know you want to." J.B. responded, "No, I don't." J.B. confronted Appellant with the fact that she knew he had done this to S.Q. and asked him about it.

J.B. testified that she said no when Appellant started to put his hands up her shirt, said no again when he put his hands down her pants, and said no a third time when he began to perform oral sex on her. She tried to pull her pants back up and tried to push him off her with her feet. When Appellant exposed himself and asked her to perform oral sex, she refused. She kept telling him she needed to watch the boys and tried to get up twice, but he pulled her back down. She did not consent and told him no.

The incident happened at approximately 2:00 p.m. Shawn Young arrived home at about 3:00 p.m., and Appellant and Lane left, as did Shawn. When Conrad Workman came over, J.B. started crying. She was very upset and crying when Tina came home. J.B. told Tina what happened. J.B. attempted to find a way to report the matter to police without her mother finding out because it was Mother's Day. Shawn Young discussed the matter with the police and J.B. reported it that night. J.B. told Conrad, Tina, Alisha, S.Q. and P.Q. what happened to her.

On the afternoon after his assault on J.B., Appellant drove slowly by Tina Cooper's apartment, where the incident with J.B. had taken place, and stared into the window. He pulled into the driveway and continued to stare, and then drove slowly away.

S.Q. had told J.B. what happened to her. When J.B. called and told S.Q. what Appellant had done to her, S.Q. talked to her mother and the next day her mother talked to the police and took her to the hospital. S.Q. told the nurse, the doctor, the police, her mother, her cousin Rachel, and a few of her friends what had happened to her. S.Q. was examined by Dr. Sandra Funk, a gynecologist. Dr. Funk found that S.Q. had no hymen and said she had been sexually assaulted some months before. Dr. Funk also examined J.B., who had reported a sexual assault both to police and to her. J.B. had no hymen. Dr. Funk's findings were consistent with what J.B. told her.

Appellant waived his Miranda rights and told police that he had consensual sex with S.Q. Appellant declined to testify at trial, but called his boss and a co-worker to testify that he had worked on February 28, 1996, at a construction site in Shawnee, Kansas, and that they had quit working at 3:30 p.m. and did not arrive home until 5:00 p.m. Neither man recalled that specific day, but each based his testimony on records showing that Appellant had worked for eight hours that day, although the records did not indicate his start or stop time. Appellant also called his stepfather to testify that the bed in the basement did not contain a headboard. In closing argument, Appellant contended that neither incident happened.

The jury convicted Appellant on all three charges and assessed and declared punishment at seven years imprisonment for statutory rape of S.Q., four years imprisonment for deviate sexual assault of J.B., and five years imprisonment for statutory sodomy of S.Q. The court sentenced Appellant in accordance with the jury's recommendations and ordered the sentences for statutory rape and statutory sodomy to run concurrently, with the four-year sentence for deviate sexual assault to run consecutively. This appeal followed.

## Argument

Appellant's sole point on appeal is that the trial court erred and abused its discretion in sustaining, over objection, the State's motion to rejoin Count II with Counts I and III for a joint trial because this ruling violated Appellant's rights to due process and a fair trial before a fair and impartial jury. Appellant argues that joinder was improper because the nonconsensual sexual offense charged in Count II was not part of the same transaction, a common scheme or plan, or of the same or similar character as the statutory offenses charged in Counts I and III. Appellant further argues that the trial court's prior order severing the offenses correctly recognized that a joint trial would cause "substantial prejudice" to Appellant because evidence of Count II would not be admissible in a separate trial on Counts I and III, and Appellant had an alibi for Counts I and III, but not Count II. Appellant argues that the State's concern that four venire panels would have to be called in order to have separate trials and the State's potential need to explain why S.Q. and her mother waited until May to report the February 28 incident to police were not proper bases for rejoining the offenses.

The State argues that the trial court did not err by sustaining the State's motion to rejoin Count II with Counts I and III because the offenses were of a similar character and the State's evidence established that the offenses were connected because the offense against J.B. caused the offense against S.Q. to be reported to the police.

■ A defendant in a criminal action does not have a state or federal constitutional right to be tried on only one offense at a time. *State v. Kelley*, 901 S.W.2d 193, 202 (Mo.App. W.D.1995). Section 545.140.2 and Rule 23.05 provide that two or more offenses may be joined if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Joinder of offenses is either proper or improper under the law. *Kelley*, 901 S.W.2d at 202. Joinder is proper if any one of the criteria in § 545.140.2 exists. *State v. Med-*

*er*, 870 S.W.2d 824, 828 (Mo.App. W.D.1993). Liberal joinder of criminal charges is favored for the sake of judicial economy. *Kelley*, 901 S.W.2d at 202. We consider only the State's evidence in determining whether joinder was proper. *State v. Kelly*, 956 S.W.2d 922, 925 (Mo.App. W.D.1997).

■ Similar tactics are sufficient to constitute acts of the same or similar character under § 545.140.2. *Id.* For the purpose of joinder, the manner in which the crimes were committed should be so similar it is likely the same person committed all the charged offenses. *Id.* Comparable tactics, which resemble or correspond in nature, are sufficient to establish that offenses are of the same or similar character; the tactics need not be identical. *State v. Howton*, 890 S.W.2d 740, 744 (Mo.App. W.D.1995). In this case, we find that the offenses were "of the same or similar character."

In *State v. Conley*, 873 S.W.2d 233, 238 (Mo. banc 1994), the Missouri Supreme Court held that four counts of sodomy, three counts of sexual assault in the first degree, and one count of attempted sodomy, involving five victims, were properly joined. The court found that all of the offenses involved illicit sexual conduct toward minors, and held that because the offenses occurred at the same location during a two-year period, the requirement that the offenses be "of the same or similar character" was satisfied. In *Meder*, 870 S.W.2d at 829, this court found that three counts of rape were sufficiently similar, and thus properly joined, where the three victims were defendant's daughters, the rapes occurred in the same location in a two-week period, and the defendant threatened the victims after the rapes.

■ The offenses in the present case contain similarities comparable to those in *Conley* and *Meder*. All of the charges involved illicit sexual conduct with minors. Appellant knew both victims. In both cases, Appellant got the victim alone in a bedroom and repeatedly badgered her for sex. Appellant removed each victim's clothing, disregarded the victim's objections, performed deviate sexual intercourse (including inserting his tongue and hands in each girl's vagina), and

then badgered the victim for sexual intercourse. In each case, the crimes were followed by threats against the victims.[2] Both incidents occurred within a three-month period.

Appellant argues that the incidents were not sufficiently similar because one of the incidents allegedly occurred while Appellant and the victim were alone, while the other allegedly occurred while there were two young children running in and out of the room. However, keeping in mind that the acts need not be identical, we find that despite this difference, the acts are sufficiently similar for the purpose of joinder.

The judgment of the trial court is affirmed.

All concur.

---

2. After the incident with S.Q., Appellant told her that if he got in trouble, he would burn down her house. After the incident with J.B., Appellant slowly drove his vehicle past the apartment where the incident occurred, parked in the driveway, and stared in the window of the apartment.